

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JERRY KELLEY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WACHOVIA CORP; JOHN D. BAKER, II; PETER C. BROWING; JOHN T. CASTEEN, III; JEROME A. GITT; WILLIAM H. GOODWIN, JR.; MARYELLEN C. HERRINGER; ROBERT A. INGRAM; DONALD M. JAMES; MACKEY J. MCDONALD; JOSEPH NEUBAUER; TIMOTHY D. PROCTOR; ERNEST S. RADY; VAN L. RICHEY; RUTH G. SHAW; LANTY L. SMITH; G. KENNEDY THOMPSON; DONA DAVIS YOUNG; BENJAMIN J. JOLLEY; SHANNON MCFAYDEN; and JOHN AND JANE DOES 1-20,<br><br>Defendants. | CASE NO:<br><br>**CLASS ACTION COMPLAINT**<br><br> |

---

## COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

### I.    INTRODUCTION

1.    Plaintiff Jerry Kelley is a participant in the Wachovia Savings Plan (the "Plan") covering substantially all employees of Wachovia Corporation and its subsidiaries ("Wachovia" or the "Company") and brings this action on behalf of himself and a class of all others similarly situated (the "Participants"). Plaintiff's allegations are based upon personal information as to himself and the investigation of Plaintiff's counsel, which included a review of U.S. Securities

and Exchange Commission ("SEC") filings by Wachovia Corp., including the Company's proxy statements (Form DEF 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current periodic reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of the Plan, a review of the Forms 5500 filed by the Plan with the U.S. Department of Labor (the "Department of Labor"), interviews with participants of the Plan, and a review of available documents governing the operations of the Plan, and media reports about the Company. Plaintiff believes significant additional evidentiary support will exist for the allegations set forth herein and can be revealed after a reasonable opportunity for discovery.

## II.    NATURE OF THE ACTION

2.    This is a class action brought on behalf of the Plan pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plan for violations of ERISA.

3.    The Plan is a retirement plan sponsored by Wachovia.

4.    Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the period January 23, 2007, through the present (the "Class Period").

5.    Plaintiff alleges that Defendants allowed the heavy, imprudent investment of the Plan's assets in Wachovia common stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was unduly risky and imprudent due to the Company's serious mismanagement and improper business practices, including, among other things: (a) the Company's reckless concentration on loan production in spite of the declining mortgage market; (b) the Company's failure to limit its exposures and risks especially with

respect to the acquisition of Golden West Financial Corporation ("Golden West"); (c) the Company's failure to accurately account for its high-risk mortgage and collateralized debt obligation ("CDO") holdings; and (d) Wachovia's repeated misrepresentations of the Company's true financial condition, all of which caused Wachovia's financial statements to be misleading and which artificially inflated the value of shares of Wachovia stock in the Plan. During the Class Period, the Company was seriously mismanaged and faced deteriorating financial circumstances that rendered Wachovia stock an unduly risky and inappropriate investment option for Plan participants' retirement savings. As a result of the aforementioned, the Company faced dire financial circumstances and other circumstances.

6.    As more fully explained below, during the Class Period, Defendants imprudently permitted the Plan to hold and acquire over one billion dollars in Wachovia stock. Based on publicly available information for the Plan, it appears that Defendants' breaches have caused the Plan to lose over *1.2 billion dollars* of retirement savings.

7.    This action is brought on behalf of the Plan and seeks to recover losses suffered by the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). Under § 502(a)(3) of ERISA, 29 U.S.C § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

8.    ERISA §§ 409(a) and 502(a)(2) authorize participants such as the Plaintiff to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty as alleged herein. Pursuant to that authority, Plaintiff brings this action as a class action

under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested in Wachovia common stock during the Class Period.

9.      In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are, by necessity, upon information and belief. At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiff's claims.

### III.    JURISDICTION AND VENUE

10.     Plaintiffs are authorized to bring this action on behalf of the participants and beneficiaries of the Plan pursuant to §502(a)(2) of ERISA, 29 U.S.C. §1132(a)(2), to obtain appropriate relief under §§502 and 409 of ERISA, 29 U.S.C. §§1132 and 1109.

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     This Court has personal jurisdiction for the following reasons. ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). Defendants are either residents of the United States or subject to service in the United States. Additionally, this Court has personal jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

13.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches

for which relief is sought occurred in this district, and some of the Defendants reside and transact business in this district.

## IV.   CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Rules 23(a),(b)(1),(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiff and a class (the "Class") of persons similarly situated, defined as follows:

> All persons, other than Defendants and their immediate family members, who were participants in or beneficiaries of the Plan at any time between January 23, 2007 and the present, and whose accounts included investments in Wachovia stock.

15.    The fiduciaries of the Plan knew or should have known at least by January 23, 2007 that the Company's material weaknesses were so pervasive that Wachovia stock could no longer be offered as a prudent investment for a retirement Plan.

16.    Plaintiff meets the following requirements of Rule 23(a) to bring this action on behalf of the class:

> (a)   **Numerosity**. The class consists of thousands of individuals and is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, based on the Plan's Form 5500 for Plan year 2004, over one-hundred thousand active participants in the Plan who participated in, or were beneficiaries of, the Plan during the Class Period;

> (b)   **Commonality**. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(i) Whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class for having the responsibility of selecting, evaluating, and monitoring the investments of the Plans, including Wachovia stock;

(ii) Whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(iii) Whether Defendants violated ERISA; and

(iv) Whether the Plan has suffered losses as a result of Defendants' fiduciary breaches and, if so, what is the proper measure of damages.

(c) **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class. To the extent Plaintiff seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(2), his claim on behalf of the Plan is not only typical to, but identical to a claim under this section brought by any Class member. Also, to the extent Plaintiff seeks relief under ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief would affect all Class members equally; and

(d) **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class as a whole.

17.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

18.    Class action status in this ERISA action is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of

6

adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

19.    A class action is the superior method for the fair and efficient adjudication of this controversy per Rule 23(b) for the following reasons: (a) joinder of all members of the class is impracticable; (b) prosecution of separate actions by the members of the Class would create a risk of establishing incomparable standards of conduct for Defendants; (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members; (d) adjudications with respect to individual members of the Class would be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede the other members' ability to protect their interests; and (e) a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## V.    PARTIES

### A.    PLAINTIFF

20.    Plaintiff Jerry Kelley is a resident of Concord, North Carolina in Cabarrus County. Plaintiff is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and was a participant in the Plan throughout the Class Period.

### B.    DEFENDANTS

21.    All the Defendants listed below are fiduciaries of the Plan within the meaning of ERISA, as is explained below and all of them breached their fiduciary duties in various ways as is also explained below.

22.    **Defendant Wachovia Corp.,** a holding company, is a North Carolina corporation with its principal place of business at One Wachovia Center. 301 South College Street, Charlotte,

North Carolina. The Company provides a wide range of commercial and retail banking and trust services throughout the United States. Specifically, the Company provides financial services, including mortgage banking investment banking, investment advisory, home equity lending, asset-based lending, leasing, insurance, international and securities brokerage services, through its subsidiaries. Wachovia's four key businesses include: (1) Capital Management; (2) the General Bank; (3) Wealth Management; and (4) the Corporate and Investment Bank.

23.     Wachovia common stock is listed on the New York Stock Exchange and trades under the ticker symbol "WB." As described more fully below, the Company was a fiduciary for the Plan as both Plan Sponsor and Plan Administrator during the Class Period.

24.     **Director Defendants.** As explained more fully below, the Plan assigns certain fiduciary responsibilities and duties to the Wachovia Board of Directors (hereinafter the "Board") which is the governing body of Wachovia under its charter, its bylaws, and applicable New York law. The Board and its members listed below are referred to as the "Director Defendants." On information and belief the members of the Director Defendants during the Class Period included:

a)     **Defendant John D. Baker, II** has served as a Director of Wachovia since 2001;

b)     **Defendant Peter C. Browning** has served as a Director of Wachovia since 2001;

c)     **Defendant John T. Casteen, III** has served as a Director of Wachovia since 2001;

d)     **Defendant Jerome A. Gitt** has served as a Director of Wachovia since 2006;

e)     **Defendant William H. Goodwin, Jr.** has served as a Director of Wachovia since 1993;

8

f)     **Defendant Maryellen C. Herringer** has served as a Director of Wachovia since 2006;

g)     **Defendant Robert A. Ingram** has served as a Director of Wachovia since 2001;

h)     **Defendant Donald M. James** has served as a Director of Wachovia since 2004;

i)     **Defendant Mackey J. McDonald** has served as a Director of Wachovia since 1997;

j)     **Defendant Joseph Neubauer** has served as a Director of Wachovia since 1996;

k)     **Defendant Timothy D. Proctor** has served as a Director of Wachovia since 2006;

l)     **Defendant Ernest S. Rady** has served as a Director of Wachovia since 2006;

m)     **Defendant Van L. Richey** has served as a Director of Wachovia since 2004 and during the Class Period sold approximately 2,000 shares of Company stock for proceeds of approximately $109,000 at the same time as he was causing the Plan and its Participants to acquire and hold Company stock;

n)     **Defendant Ruth G. Shaw** has served as a Director of Wachovia since 1994;

o)     **Defendant Lanty L. Smith** has served as a Director of Wachovia since 1987 and as Chairman of the Board of Directors of Wachovia since May 8, 2008. Defendant Smith has served as the Interim Chief Executive Officer since January 1, 2008;

p)     **Defendant G. Kennedy Thompson** served as the Chairman of the Board of Directors of Wachovia from 2003 until May 8, 2008, and as a Director from 1999 until his resignation effective June 1, 2008. Defendant Thompson also served as the Company's President and Chief Executive Officer until his resignation.

During the Class Period, Defendant Thompson sold approximately 246,000 shares of Company stock for proceeds of approximately $8 million at the same time as he was causing the Plan and its Participants to acquire and hold Company stock; and

q)   **Defendant Dona Davis Young** has served as a Director of Wachovia since 2001.

25.   **Management Resources and Compensation Committee Defendants.**  As is explained more fully below, the Management Resources and Compensation Committee ("Compensation Committee") is appointed by the Board and had responsibility for various oversight responsibilities.  The Defendants identified in this paragraph are referred to as the "Compensation Committee Defendants."   On information and belief, the Compensation Committee Defendants during the Class Period are as follows:

a)   **Defendant Peter C. Browning** served as a member of the Compensation Committee during the Class Period;

b)   **Defendant Robert A. Ingram** served as a member of the Compensation Committee during the Class Period;

c)   **Defendant Mackey J. McDonald** served as a member of the Compensation Committee during the Class Period;

d)   **Defendant Timothy D. Proctor** served as a member of the Compensation Committee during the Class Period; and

e)   **Defendant Ruth G. Shaw** served as a member of the Compensation Committee during the Class Period.

26.   **Wachovia Benefits Committee Defendants.**  As is explained in more detail below, the Plan assigned certain fiduciary responsibilities and duties to the Wachovia Benefits

Committee ("Benefits Committee"), including the responsibility for selecting the investment funds in the Plan and for monitoring the performance of those funds. The Benefits Committee members also have full authority and power to administer and construe the Plan. On information and belief, the Benefits Committee Defendants during the Class Period are as follows:

a)    **Defendant Benjamin J. Jolley** served as Senior Vice President, Wachovia Benefits Committee during the Class Period. Defendant Jolley signed the Company's 11-K filing with the SEC regarding the Plan's Annual Report.

27.    The identities of the remaining members of the Benefits Committee are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 1-10. Once the identities of the remaining Benefits Committee members are ascertained, Plaintiff will seek leave to join them under their true names. Defendant Jolley and John and Jane Does 1-10 are referred to collectively, as the "Benefits Committee Defendants."

28.    **Human Resources Division of Wachovia Defendants**. As is explained in more detail below, the Plan assigned certain fiduciary responsibilities and duties to the Benefits Committee who then delegated the responsibility to administer and construe the Plan to the Human Resources Division of Wachovia (the "HR Defendants"). On information and belief, the HR Defendants during the Class Period are as follows:

a)    **Defendant Shannon McFayden** served as Head of Human Resources and Corporate Relations during the Class Period. During the Class Period, Defendant McFayden sold approximately 2,500 shares of Company stock for proceeds of approximately $403,000 at the same time causing the Plan and its Participants to acquire and hold Company stock.

29.    The identities of the remaining HR Defendants are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 11-20. Once the identities of the remaining HR Defendants are ascertained, Plaintiff will seek leave to join them under their true names. Defendant McFayden and John and Jane Does 11-20 are referred to collectively, as the "HR Defendants."

## VI.    THE PLAN

### A.    THE WACHOVIA SAVINGS PLAN

30.    On information and belief, the Plan,[1] sponsored by Wachovia, is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and/or beneficiaries.

31.    The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plan were held in trust by Wachovia Bank, National Association, the Plan's trustee. *See* Wachovia Savings Plan, Annual Report (Form 11-K) (Dec. 31, 2006) (hereinafter the "2006 Plan 11-K") at Note 3; Wachovia Savings Plan Prospectus (Nov. 2004) (hereinafter the "Plan Prospectus") at 6. All contributions made to the Plan constitute a form of deferred compensation.

32.    The purpose of the Plan is "designed to promote savings for retirement." 2006 Plan 11-K at Note 1.

---

[1] Effective December 31, 2006, the assets of the Westcorp Employee Stock Ownership and Salary Savings Plan were transferred to the Wachovia Savings Plan. *See* Westcorp Employee Stock Ownership and Salary Savings Plan, Annual Report (Form 11-K) (Dec. 31, 2006) at Note 11.

33.    A full-time employee is eligible to participate in the Plan beginning on the first day of the month following the month in which they complete one full calendar month of service. 2006 Plan 11-K at Note 1; Plan Prospectus at 3.

34.    At all relevant times, the Plan had two separate components: (1) a contributory component, which consisted of participant contributions; and (2) a matching component, ("Company Matching Contributions") which consisted entirely of employer contributions. *Id.*

35.    Participants in the Plan are permitted to defer a percentage of their base compensation for investment in the Plan. Participants in the Plan are allowed to contribute up to 30 percent of their eligible compensation. 2006 Plan 11-K at Note 1; Plan Prospectus at 4.

36.    Throughout the Class Period, the Plan offered various investment options for participant contributions, including the Wachovia Corp. Common Stock Fund, for Plan participants employed by Wachovia, or one of its subsidiaries that is taxable as a corporation, and the Wachovia Stock Non-ESOP Fund, for Plan participants who are employed by an entity of the Company that is taxable as a partnership. Plan Prospectus at 6.

37.    Throughout the Class Period, the Company made Company Matching Contributions to the Plan. Employees become eligible for Company Matching Contributions upon completing one year of service. 2006 Plan 11-K at Note 1; Plan Prospectus at 3. The percentage of Company Matching Contributions is determined annually by the Wachovia Human Resources and Corporate Relations Director, the Executive Vice President of Human Resources, and/or the Wachovia CEO, but cannot exceed six percent of a participant's eligible compensation. 2006 Plan 11-K at Note 1; Plan Prospectus at 6.

38.    The first one percent of the Company Matching Contribution is made in Wachovia common stock and credited to a participant's account in either the Wachovia Corp.

Common Stock Fund, for Plan participants employed by Wachovia, or one of its subsidiaries that is taxable as a corporation, or in the Wachovia Stock Non-ESOP Fund, for Plan participants who are employed by an entity of the Company that is taxable as a partnership. Plan Prospectus at 7. Participants can immediately elect to liquidate the Wachovia common stock credited to the employee's account as a Company Matching Contribution by transferring the value of the common stock to an alternate investment option in the Plan. 2006 Plan 11-K at Note 1; Plan Prospectus at 7.

39.    Participants are fully vested in their personal contributions and in the Company Matching Contributions at all times. 2006 Plan 11-K at Note 1; Plan Prospectus at 12.

40.    On information and belief, the Wachovia Corp. Common Stock Fund and the Wachovia Stock Non-ESOP Fund were not required features of the Plan. It was a discretionary decision made by the Plan's fiduciaries, by and through the Benefits Committee Defendants, to offer Wachovia common stock as an investment option in the Plan.

41.    Nothing in the Plan limits the ability of the Plan's fiduciaries to remove the Wachovia Corp. Common Stock Fund and the Wachovia Stock Non-ESOP Fund as investment alternatives or divest assets invested in the options as prudence dictates.

42.    During the Class Period, Wachovia common stock represented significant portion of the Plan's assets.

43.    The Plan has incurred substantial losses as a result of the Plan's investment in Wachovia stock. As of December 31, 2006, the Plan held approximately 34 million shares of Wachovia stock, then having a market value of approximately $1.8 billion, and representing 22 percent of the net assets of the Plan. 2006 Plan 11-K, Schedule 1 at 2-3.

44.    Following revelations of the Company's serious mismanagement and improper business practices, Wachovia stock has declined approximately 65 percent since the beginning of the Class Period.  These improper business practices included reckless concentration on loan production in spite of the declining mortgage market, failure to limit its exposures and risk especially with respect to the acquisition of Golden West, failure to accurately account for its high-risk mortgage and CDO holdings, and repeated misrepresentation of the Company's true financial condition.

B.    **ESOP COMPONENT**

45.    Effective January 1, 1999, the portion of Plan invested in the Wachovia Corp. Common Stock Fund was amended to be an Employee Stock Ownership Plan ("ESOP").  2006 Plan 11-K at Note 1.

46.    The definition of an "employee stock ownership plan," under ERISA § 407, is an ERISA plan that is designed to invest primarily in qualifying employer securities. 29 U.S.C. § 1107(d)(6)(A).  On information and belief, the Plan did not satisfy all of the statutory and regulatory mandates with respect to ESOP design and/or operations.

47.    Even if the portion of the Plan designated as an ESOP satisfies all of the applicable regulatory requirements for this designation, as with a 401(k) plan without an ESOP component, fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

48.    With respect to an ESOP, if the fiduciaries know or if a sufficient investigation would reveal that company stock no longer is a prudent investment, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the Plan assets in other suitable investments.  Here, this course of action was all the more

appropriate because Company stock was not a required feature of the Plan, but, to the contrary, was a discretionary feature made available at the direction of the Plan Administrator.

## VII.   DEFENDANTS' FIDCUIARY STATUS

### A.    FIDUCIARY STATUS GENERALLY

49.    Every ERISA plan must have one or more "named fiduciaries" who will have "authority to control and manage the operation and administration of the Plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

50.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent:

>    (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets;

>    (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so; or

>    (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

16

51.    Each of the Defendants is a fiduciary to the Plan and owes fiduciary duties to the Plan and its participants and beneficiaries under ERISA to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

52.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investment solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a similar type and with similar aims.

53.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

54.    Wachovia chose to assign the appointment and removal of fiduciaries to the Monitoring Defendants named herein instead of delegating all fiduciary responsibility for the Plan to external service providers. These persons and entities in turn selected Wachovia employees, officers and agents to perform most fiduciary functions.

55.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3). But insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor. As stated by the Department of Labor, the agency charged with responsibility for enforcing ERISA, it is never prudent for a retirement plan fiduciary to invest Plan assets in artificially inflated stock.

56.    While a fiduciary's duty of prudence does not include a general duty to diversify with respect to company stock in an ERISA-governed retirement plan, a fiduciary has a duty of prudence which includes a duty not to ignore circumstances, such as those here, which increase beneficiaries' risk of loss and the overall magnitude of that potential loss to an imprudent and unacceptable level.

B.    **THE COMPANY'S FIDUCIARY STATUS**

57.    Wachovia, at all applicable times, has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan, including the Director Defendants, the Compensation Committee Defendants, the Benefits Committee Defendants, and the HR Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will. Wachovia is, therefore, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

58.    Under basic tenets of corporate law, Wachovia is imputed with the knowledge that the Defendants had regarding the misconduct alleged herein, even if not communicated to Wachovia.

59.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Company was a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

C.     THE DIRECTOR DEFENDANTS' FIDUCIARY STATUS

60.     Wachovia, as a corporate entity, cannot act on its own.  Upon information and belief, during the Class Period, the Company relied and continues to rely directly on the individual Defendants named herein to carry out its fiduciary responsibilities under the Plan and ERISA.

61.     Under Wachovia's charter and bylaws, the Board had the authority to manage the business and affairs of Wachovia.  Because Wachovia was, as alleged above, a fiduciary of the Plan during the Class Period, so, necessarily, was the Board and its members, which had the ultimate authority for the affairs of Wachovia.

62.     Moreover, the Director Defendants are charged with the appointment of following Plan fiduciaries: the Compensation Committee members and the Benefits Committee members. Accordingly, the Director Defendants had the duty to monitor, and to remove, the Compensation Committee Defendants and the Benefits Committee Defendants.   Therefore, according to Department of Labor regulations, the Director Defendants exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8(D-4).

63.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Director Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

19

D.   **MANAGEMENT RESOURCES AND COMPENSATION COMMITTEE DEFENDANTS' FIDUCIARY STATUS**

64.    The Compensation Committee is a committee of the Board.  According to the Charter of the Management Resources and Compensation Committee, the Compensation Committee Defendants had various responsibilities, including the following duty:

> To review and make policy recommendations from time to time with respect to various benefit plans for the Corporation's employees, including the pension and savings plans, group insurance plans, and such other plans as the Committee may from time to time deem advisable and appropriate, and, at the Committee's discretion, convey appropriate administrative authority to the Corporation's management of such plans...

Charter of the Management Resources and Compensation Committee at 3.

65.    The Compensation Committee was to report the information from its activities to the Board and, where appropriate, its recommendations for action by the Board.  *Id.* at 4.

66.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

E.   **BENEFITS COMMITTEE DEFENDANTS' FIDUCIARY STATUS**

67.    The Benefits Committee is responsible for the selection of the investment options offered under the Plan and, therefore, the Benefits Committee is a "named fiduciary" of the Plan for investment purposes as that term is defined under ERISA.  *Id.*

68.    The Benefits Committee is also the "Administrator" of the Plan but has delegated the responsibility for the administration, daily operation and interpretation of the Plan to the

Human Resources Division of Wachovia. Plan Prospectus at 11-12. Accordingly, the Benefits Committee Defendants had the duty to monitor, and to remove, the HR Defendants. Thus, according to Department of Labor regulations, the Benefits Committee Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8(D-4).

69.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Benefits Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**F.    HUMAN RESOURCES DIVISION OF WACHOVIA DEFENDANTS' FIDUCIARY STATUS**

70.    The HR Defendants had been delegated the duties of the administration, daily operation and interpretation of the Plan by the Benefits Committee. Plan Prospectus at 11-12. The HR Defendants, were therefore the "Administrator" with respect to Plan, as defined in ERISA § 3(16)(A).

71.    Upon information and belief, in order to comply with ERISA, the HR Defendants exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner, by means of the Plan's Summary Plan Description ("SPD"). The plan administrator must furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description. *See, e.g.,* ERISA § 101(a)(1), 29 U.S.C. § 1021(a)(1). These SPD's incorporated by reference Wachovia's SEC filings, thus converting such materials into fiduciary communications.

## VIII.    FACTS BEARING ON FIDUCIARY BREACH

**A.    WACHOVIA – AN IMPRUDENT INVESTMENT FOR THE PLAN DUE TO SERIOUS MISMANAGEMENT AND RAPID DETERIORATION IN FINANCIAL CONDITION DUE TO CONCENTRATION ON HIGH-RISK BUSINESS.**

### 1.    Subprime Lending Industry

72.    In late 2004 and early 2005, media reports began issuing warnings that relaxed lending practices were increasing risks for borrowers and lenders in overheated housing markets. *See* Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keeping Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1. By making it easier for borrowers to qualify for a loan through such practices described below, lenders were greatly increasing the likelihood that borrowers would be unable to make payments, and that defaults would increase.

73.    Of particular concern was the significant amount of adjustable-rate loans all under the lowered lending standards, making it more likely that early payment defaults would occur in the event of an interest rate hike or change in the housing market.

74.    In May 2005, bank regulators issued their first-ever guidelines for credit-risk management for home-equity lending. In December 2005, new guidelines for mortgage lenders entitled "Interagency Guidance on Nontraditional Mortgage Product Risks" were issued in the hopes of stemming the proliferation of risky management practices of subprime mortgage lenders. *Id.*; *See* Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., *Testimony Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate: Federal Deposit Insurance Corporation on Mortgage Market Turmoil: Causes and Consequences*, Mar. 22, 2007, *available at* http://www.fdic.gov/news/news/speeches/chairman/spmar22071.html.

75.    The proposed guidelines sent a clear message to the marketplace that bank regulators were concerned about the lessened underwriting standards and the slack risk management practices of subprime lenders.

76.    Nonetheless, most subprime lenders failed to heed these and other warnings. Despite rising interest rates and the housing market cooling off in 2005, lenders continued to offer borrowers credit under weakened lending standards. Even after short-term interest rates began rising in June 2005, many lenders kept introductory "teaser" rates low. It was not until mid to late 2006 when lenders began to tighten up their terms.

77.    By the middle of 2005, delinquency rates (60-days or more past due) for subprime loans rose for the first time since 2002. By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more severely. In mid-October 2005, the delinquency rate was twice that recorded on new subprime loans a year prior. *See* Ruth Simon & James R. Hagerty, *More Borrowers With Risky Loans Are Falling Behind - Sub prime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006, at A1.

78.    Total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006 and foreclosures rose from 1.47% to 2.0% over the same period according to the FDIC. Testimony of Sandra L. Thompson, *supra*.

79.    Accounting for the largest rise in delinquency rates were subprime loans with ARMs, an increase from 9.83% to 14.44% between the fourth quarter of 2004 and the fourth quarter of 2006. Foreclosures rose from 1.5% to 2.7% during the same period. *Id.* Approximately 80,000 subprime borrowers fell into delinquency in 2006. *See* Simon & Hagerty, More Borrowers, *supra*.

80.    Holding an expansive loan portfolio became even riskier in 2006, when the subprime lenders further lowered their standards, sourcing no-documentation and low-documentation loans, known in the industry as "liar loans." This practice constituted as much as 40 percent of subprime mortgages issued in 2006, up from 25 percent in 2001. Gretchen Morgenson, *Crisis Looms in Mortgages*, N.Y. Times, Mar. 11, 2007. Mortgage industry research reported in April 2006 revealed that 90 percent of borrowers had overstated their incomes by 5 percent or more and had inflated their incomes by more than half in 60 percent of the cases. *Id.*

81.    The rate of delinquency and foreclosure shortly after origination in 2006 suggests that lenders underestimated the risk involved and borrowers did not fully understand the full costs of these loans.

82.    In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market. Ron Nixon, *Study Predicts Foreclosure For 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006. Shortly after, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings.

### 2.    Wachovia's Focus on Business in the Troubled Mortgage Market and the Company's Risk Management Oversights Made Wachovia Stock a Highly Risky Investment During the Class Period.

83.    Despite warnings from industry analysts and government regulators, Wachovia continued to grow its business in the mortgage market and engage in risky and inappropriate business practices leading up to and during the subprime fallout. The risk of large loss was due to a variety of factors, including but not limited to:

- Wachovia's concentration on business directly affected by the tightening mortgage and credit markets;

24

- The Company's failure to employ the business skill-set necessary to manage and understand the risks and their changing nature in a volatile market;

- Wachovia's failure to re-evaluate its exposure to the high risks of mortgage-backed and asset-backed securities;

- The Company's focus on its massive loan portfolio and loan production despite deteriorating housing market conditions;

- Ignoring or disregarding sector-wide write-downs by major financial holding companies signifying Wachovia's own increased risks and exposures;

- The Company's continued concentration on its CDO business, even as credit markets deteriorated and subprime mortgage defaults increased;

- Wachovia's stockpiling of CDOs and risky residential and commercial mortgage-backed securities and other risky investment products that faced illiquidity and deflating values as the market for these products dried up;

- Wachovia's ill-timed acquisition of Golden West, one of the nation's biggest mortgage originators;

- Wachovia's failure to accurately disclose the effects of the Golden West acquisition on Wachovia's capital position, and the Company's additional risks and exposures to loss;

- The Company's failure to set aside adequate loan-loss reserves in anticipation of future losses, in spite of market volatility, constricted credit conditions, and steady declines in the mortgage and credit markets;

- The Federal investigation of Wachovia in relation to alleged money laundering schemes surrounding the Mexican and Colombian drug trades. *See* Evan Perez

and Glenn R. Simpson, *Wachovia is Under Scrutiny in Latin Drug-Money Probe*, Wall St. J., April 26, 2008;

- The Justice Department, Internal Revenue Service, and SEC inquiries focusing on alleged big-rigging in the management of cash raised by municipalities. *See* Kara Scannell, *Charges Near In Investigation of Muni Cash—Did Financial Firms Make Improper Bids to Win Investments?*, Wall St. J., Mar. 5, 2008;

- Wachovia's participation in a fraudulent telemarketing scheme that using "the bank's accounts to steal millions of dollars from unsuspecting victims." Charles Duhigg, *Papers Show Wachovia Knew of Thefts*, N.Y. Times, Feb. 6, 2008;

- The Company's involvement in the auction-rate securities market, which dried up during the Class Period and resulted in investor complaints regarding the marketing and disclosures of the supposedly conservative, liquefiable investments. *See e.g., Waldman, et al. v. Wachovia Corp., et al.* 2:08cv02913-SAS (Complaint filed Mar. 19, 2008);

- The several state security regulators' investigation of Wachovia's auction rate securities after hundreds of investors filed complaints because of an inability to access their money. Ieva M. Augstums, *Wachovia Securities Headquarters are Raided in Auction Rate Probe*, Associated Press, July 17, 2008.

- The Defendants attempts to conceal the magnitude of Wachovia's exposure to losses by providing a positive outlook for the Company when the Defendants knew, or should have known, that the economy's steady decline meant that the Company's true financial condition would come to light and severely impact its inflated share price.

a.    **Wachovia's Increasing Involvement in its CDO Business Despite Market Volatility**

84.    Generally speaking, CDOs are pools of bonds, loans, and other asset-backed securities. After mortgages are written, investment banks pool them together and use the cash flows they produce to pay off mortgage-backed bonds, which are underwritten by investment banks. The mortgage bonds, in turn, are often packaged again into CDOs and sold to investors in slices. Between 2004 and 2006, Wachovia expanded its business operations in the mortgage market to include assembling, selling, servicing and holding riskier financial instruments, including structured credit products, mortgage-backed securities, asset-backed securities, and CDOs.

85.    In 2006, CDOs took in an estimated $250 billion of mortgage-backed bonds, the vast majority of which were underpinned by subprime mortgages. While a bank such as Wachovia is working with a Wall Street bank to buy and collect securities to be bundled and converted to CDOs for sale, that bank often bears the risk of short-term fluctuations in prices of the bonds prior to the sale of the CDO. By 2007, Wachovia was the nation's third largest CDO manager in the nation. Wachovia Corp., Annual Report (Form 10-K) (Feb. 28, 2007) at 11.

86.    Despite these risk factors, Wachovia continued to concentrate on the CDO market as a revenue source without establishing sufficient risk-management processes to safeguard its business and to limit its exposure to market volatility. Defendants knew or should have known that the CDO market was in flux and that Wachovia's focus on business in that market was at risk during the Class Period.

87.    The problems in the subprime mortgage industry led investors to demand much higher returns on CDOs they purchased, which had the impact of making them more difficult to sell and drove down prices. Regardless of the fact that most investment banks recognized the

warning signs and reduced their exposure to CDOs, Wachovia failed to take adequate measures to address or reduce its exposure to losses in its CDO market. When the subprime market collapsed, the Company found itself holding a substantial amount of debt that investors were not interested in purchasing. Despite the market indications, the Company refused to admit its vulnerability.

### b. Wachovia's Aggressively Expanded Loan Portfolio and Failure to Reduce Exposure Despite the Market Environment

88. Housing market troubles emerged in 2005, but Wachovia continued its aggressive underwriting for its own servicing portfolio and for packaging the loans for resale as part of CDOs. Between 2005 and 2006, Wachovia more than doubled its on-balance sheet holdings of consumer real estate loans.

89. During the subprime fallout, loan production was not a safe business focus. However, Wachovia persisted in doing business in this risky area and even considered growth in that area. According to an article in the *Wall Street Journal*:

> Wachovia and some other lenders still see option ARMs as a growth area. Wachovia offers extra incentives for its sales people to promote such loans. "To sell this product correctly takes more time," says Tim Wilson, head of retail operations for Wachovia's mortgage arm.
>
> Wachovia says it takes a more conservative approach than its competitors because it holds the loans it originates in its own portfolio rather than selling them off to investors. Borrowers are qualified at the rate they are expected eventually to pay on the loan, not the one used to set the minimum payment, Mr. Wilson says, and "the overwhelming majority" provide a down payment of at least 20%.

James R. Hagerty and Ruth Simon, *Option-ARMs Emerge As Home-Loan Worry,* Wall St. J., Apr. 18, 2007.

90. Analysts identified the risk management oversights of the Company's ongoing aggressive loan production. According to an article in *The New York Times*:

> Lloyd Goldman…said he thought that Wachovia may be just as
> aggressive about writing off its commercial losses as it had been in
> the past in making loans. "They were creating product faster than
> they should have or others in the industry should have,"
> Mr. Goldman said.

Christine Haughney and Terry Pristin, *Wachovia's Big-City Splash Has a Sobering Aftermath*,
N.Y. Times, Jan. 23, 2008.

91.    Throughout the Class Period, Wachovia's reckless business concentration on loan

production and servicing put the Company and its shareholders, including the Plan's participants

and beneficiaries, at risk for massive losses that would be realized once the Company's true

financial condition was disclosed.

c.    **Wachovia Made Serious Risk Management Oversights with Respect
to the Golden West Acquisition.**

92.    On May 7, 2006, Wachovia announced it would acquire Golden West in a deal

worth approximately $26 billion.    Wachovia showcased the Golden West acquisition to

shareholders, investors, and analysts as a prudent merger with a low risk profile.    The terms of

the acquisition provided that Golden West shareholders would receive 1.051 Wachovia shares

and $18.65 in cash, or $81.07 a share, an approximately 15% premium over Golden West's

closing price on May 5, 2006.    The Company insisted that the acquisition of a major loan

producer would reduce Wachovia's risks by diversifying the Company's portfolio.

93.    The Company failed to accurately disclose the risks and exposures associated

with Golden West's heavy concentration on loan production.    Almost all of Golden West's loans

were adjustable rate mortgages on residential properties, with interest rates that changed

monthly.

94.    The mortgage market was in disarray before Wachovia admitted its exposures

resulting from the Golden West acquisition.    However, the Company misleadingly continued to

highlight the merger with Golden West as a boon.    According to an article in the *Wall Street*

*Journal*, Wachovia attributed its success in the second quarter of 2007 to the Golden West acquisition:

> Wachovia Corp., the fifth-largest U.S. bank by market capitalization, said second-quarter profit rose 24% on the acquisition of lender Golden West Financial Corp., largely quelling investor concern that the deal would bring losses on home loans amid a weak housing market and high interest rates.
>
> The Charlotte, N.C., bank said revenue jumped 20% on a 53% surge in the volume of average loans driven by Golden West, an Oakland, Calif. Savings-and-loan specializing in adjustable-rate mortgages.

Corey Dade, *Golden West Fuels Wachovia Profit – Results Ease Worries Acquisition of Lender Would Spur Losses*, Wall St. J., July 21, 2007.

95.    Wachovia was finally forced to recognize the losses, risks and exposures that the Golden West deal actually brought to the Company after all market indications and analysts had come to that conclusion.  *CNN* released an article reflecting on Wachovia's disappointing first quarter results for 2008, stating in part:

> Wachovia investors are paying through the nose for the bank's ill-advised California gold rush.
>
> Shareholders in Charlotte, N.C. based Wachovia (WB, Fortune 500) were rocked Monday by a nasty one-two punch: a sudden (and dilutive) sale of common and convertible preferred stock, and the bank's first quarterly loss since 2001.  Wachovia swung to a $350 million loss in the first quarter, reversing the year-ago $1.2 billion profit, as the bank posted weak numbers across its businesses.  The breadth of the bank's losses stunned Wall Street, sending shares down 10%.
>
> Though Wall Street was rife with whispers in recent weeks of a possible writedown at Wachovia, Monday's investor presentation makes for some sober reading.  Among many other things, the bank took a $2 billion charge for "market-disruption" losses in the quarter, including a surprisingly high $729 million for unfunded loans and leveraged finance positions. Wachovia also took a $2.8 billion provision to cover credit-related losses.

The most compelling reading, however, concerns the former Golden West Financial, which Wachovia acquired in 2006 for $24.6 billion. And by "compelling" we mean cringe-inducing.

Golden West was a leading issuer of so-called option adjusted rate mortgages (ARMs) -loans that give borrowers the right to pay less than the full bill - with a portfolio now valued at roughly $120 billion. Wachovia's holdings of those loans are getting painful: Wachovia said its reserve for possible loan losses on Golden West's portfolio of Pick-a-Pay variable rate mortgages surged in the latest quarter to $1.1 billion, while late payments nearly doubled to 3.1 % of the portfolio.

While a possible $1.1 billion loss hardly seems newsworthy in this era of multibillion writedowns, the fact that 58% of Wachovia's option ARM portfolio is based in California is problematic. Independent research boutique CreditSights argues that a new computer model put into use for Wachovia's risk management is implying losses of between 7% and 8% for the Pick-a-Pay portfolio. That could mean another $2 billion of potential losses. The bank estimated that 14% of the loans appeared to have negative equity, or loan-to-value percentages of greater than 100.

To be sure, Wachovia has avoided the high-profile meltdowns sustained by Bear Steams (ESC, Fortune 500), which was sold last month to JPMorgan Chase (JPM, Fortune 500), and Citi (C, Fortune 500) and Merrill Lynch (MER, Fortune 500), both of which ousted their CEOs late last year after disclosing massive losses on mortgage-backed securities. Wachovia's chief executive, G. Kennedy Thompson, appeared contrite, telling investors that he was "deeply disappointed" by the bank's quarterly performance.

But last year, Kennedy was sounding optimistic. "We feel confident about the superior credit quality of our mortgage portfolio, the prospects for cross-selling our product set in Golden West markets, and originating Pick-a-Pay mortgages through traditional Wachovia channels." Kennedy told investors on last April's first-quarter conference call.

Roddy Boyd, *Wachovia's California Nightmare - the 2006 Purchase of Golden West Has Saddled the Bank With a Problem of Growing Proportions*, CNN, Apr. 14, 2008.

3.  **Wachovia's Dissemination of Incomplete and Inaccurate Information to Participants in the Plan**

96.  Throughout the Class Period, the Company made false statements to Plan Participants regarding its financial condition and false assurances regarding the sufficiency of its risk-management processes. These false and misleading statements caused the price of the Company's stock to be artificially inflated during the Class Period.

97.  On July 20, 2007, the Company issued a press release entitled *Wachovia Earns Record $2.34 Billion, EPS Up 4% To $1.22 – Growth Reflects Strength In Market-Related Businesses And Traditional Banking Market Expansion*, ensuring investors, including Plan Participants that the Company had full control of managing its risk. This press release, filed with the SEC as a Current Report, stated in part:

> "Our second quarter performance reflects our continued focus on execution in both the traditional banking and markets-related businesses," said Ken Thompson, Wachovia chairman and chief executive officer. "All four of our major businesses delivered double-digit earnings growth, fueled by new markets, revenue growth initiatives and an expanded product, set…The integration of Golden West is proceeding as planned, and we're excited by the cross-sell potential of our expanded platform. Additionally, our focus on efficiency and risk management continue to provide flexibility for investment for future growth."

Wachovia Corp., Current Report (Form 8-K) (July 20, 2007) at 2.

98.  The Company's stock closed at $49.98 per share on July 20, 2007.

99.  On August 21, 2007, the Company issued a press release entitled *Wachovia Corporation Increases Quarterly Dividend 14% to 64 Cents Per Share* in which the Company maintained that it had in place adequate risk management processes, both within its constituent businesses and on a Company-wide basis. This press release, filed with the SEC as a Current Report, stated in part:

> Wachovia Corporation's board of directors today approved a 14 percent increase in the company's regular quarterly cash dividend to 64 cents per common share, up from the current 56 cents per share. The new common stock dividend is payable on September 17, 2007, to shareholders of record as of the close of business on August 31, 2007.
>
> "Today's announcement reflects our Board's confidence in Wachovia's capital strength, liquidity, prudent risk profile and our future," said Ken Thompson, chairman and chief executive officer of Wachovia. "We believe it is important that our shareholders are rewarded on their investment with a growing dividend."

Wachovia Corp., Current Report (Form 8-K) (Aug. 21, 2007), Ex. 99.

100.    The Company's stock closed at $49.24 per share on August 21, 2007.

101.    While companies with similar make-up such as Citigroup Inc. and Merrill Lynch & Co., Inc. were taking heat in the markets, Wachovia touted its comparative strength and placed the blame for its own losses on market conditions:

> Wachovia Corp. today reported net income of $1.69 billion, or 89 cents per share, in the third quarter of 2007 compared with $1.88 billion, or $1.17 per share, in the third quarter of 2006.
>
> "I'm very proud of our ability to provide capital, liquidity and advice to our customers and peers in the face of the disruption in the fixed income markets in the third quarter. These conditions clearly had a disappointing impact on the results of market-oriented businesses, but the strength in our core banking and brokerage businesses continued to serve us very well," said Ken Thompson, Wachovia chairman and chief executive officer. "Our loan and deposit trends were solid, and our retail brokerage performance was strong – and poised for even more growth as our A.G. Edwards colleagues join our team. Additionally, the first of our World Savings branch and deposit conversions were completed successfully last weekend, and going forward, attention in our expanded platform returns fully to sales production. While the impact of the market disruption was significant, it's worth nothing that the majority of the lower market valuations in the third quarter largely arose from a repricing of risk in the marketplace and do not reflect deterioration in the underlying credit quality of the assets in our leveraged finance and commercial real estate securitization businesses. Looking ahead, we're taking the appropriate steps to ensure that as markets remain unsettled, we focus intently on

> actively managing our exposures and controlling costs. Longer
> term, we believe the challenges of the third quarter will be an
> advantage to companies like Wachovia with strong capital and
> liquidity positions and a clear understanding of the needs of
> customers and investors."

Wachovia Corp. Current Report (Form 8-K) (Oct. 19, 2007), Ex. 99a at 2.

102.    Although Wachovia stock dropped almost two dollars in response to the Company's reported losses, the stock still closed at $46.40 on October 19, 2007.

103.    On November 9, 2007, Wachovia filed its 10-Q for the third quarter of 2007. It listed its risk exposure to subprime-backed securities as $2.05 billion. Despite the crashing subprime market, the Company stated: "While our outlook indicates a rise in the overall level of charge-offs at this point in the credit cycle, we believe the well collateralized nature of our real estate-secured portfolio, our careful management on inherent credit risk and strong underwriting will position us relatively well in a more uncertain credit environment." Wachovia Corp. Quarterly Report (Form 10-Q) (Nov. 9, 2007), Ex. 19 at 24.

104.    That same day the press indicated that Wachovia lost about $1.1 billion in October 2007 on assets backed by loans or in other words, subprime mortgages. Eric Dash and Julia Werdigier, *Wachovia Warns of 1.1 Billion in Credit Losses*, N.Y. Times, Nov. 9, 2007.

105.    While the Company did file an 8-K with the SEC, reporting that the Company was setting aside an additional $600 million in the fourth quarter in addition to the write-downs of $1.3 billion in the third quarter, it was still hiding the most significant information regarding its risks and potential additional losses. Wachovia Corp. Current Report (Form 8-K) (Nov. 9, 2007), Ex. 99a at 16.

106.    On February 28, 2008, Wachovia filed its annual report for the year ended December 31, 2008 with the SEC. The Company reported allowances for loan losses of $4.51 billion for the end of fiscal year 2007 and stated among other things:

34

> While our outlook indicates a rise in the level of charge-offs at this point
> in the credit cycle, we believe the well-collateralized nature of our real
> estate-secured portfolio, our careful management of credit risk and strong
> underwriting position us relatively well in this credit environment.

Wachovia Corp. Annual Report (Form 10-K) (Feb. 28, 2008) at 31.

### 4. The Truth is Revealed

107.   In was not until April 14, 2008 when the Company released its results for the first

quarter of 2008 that it revealed the true and actual extent of the Company's losses.  According to

the Company's Current Report filed with the SEC:

> Wachovia reported a first quarter 2008 net loss of $350 million
> before preferred dividends, or a net loss available to common
> stockholders of $393 million, (20 cents per common share).  These
> results, which reflect higher credit costs and the continued
> disruption in the capital markets, compared with earnings of $2.30
> billion, or $1.20 per share, in the first quarter of 2007.

Wachovia Corp., Current Report (Form 8-K) (Apr. 14, 2008), Ex. 99a.

108.   On April 14, 2008, Wachovia stock closed at $25.55, a drop of about 50 percent

since the beginning of the Class Period.

109.   Shortly thereafter, on May 6, 2008, the Company issued a press release stating

that it would amend the results for the first quarter 2008.  The press release, filed as a current

report with the SEC, stated in relevant part:

> Wachovia has subsequently reviewed information regarding stable
> value agreements ("SVA") totaling $360 million provided by a third-
> party guarantor with respect to three related contracts within
> Wachovia's bank-owned life insurance ("BOLI") portfolio.  Upon
> review of such information, Wachovia has concluded that the
> company will record valuation losses of $315 million on the related
> BOLI assets . . .

Wachovia Corp., Current Report (Form 8-K) (May. 6, 2008), Ex. 99a at 2.

110.   One June 2, 2008, the Company issued a press release announcing that Defendant

Thompson, Chief Executive Officer, President and a Director of the Company, had resigned

from the Company and as a member of the Company's Board of Directors, effective June 1, 2008. Wachovia Corp. Current Report (form 8-K) (June 2, 2008), Ex. 99.

111.    One June 6, 2008, Wachovia stock closed at $20.13, a decline of 65% since the beginning of the Class Period. By July 15, 2008, Company Stock traded at just above $9 per share, a decline of nearly 85% since the beginning of the Class Period.

**B.     DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT WACHOVIA STOCK WAS AN IMPRUDENT INVESTMENT**

112.    Throughout the Class Period, Defendants knew or were reckless in not knowing that Company stock was an imprudent investment for the Plan due to the Company's serious mismanagement and improper business practices, including, among other practices, the Company's:

> (i) reckless concentration on loan production in spite of the declining mortgage market;
>
> (ii) failure to limit its exposures and risks especially with respect to the acquisition of Golden West;
>
> (iii) failure to accurately account for its high-risk mortgage and CDO holdings; and
>
> (iv) repeated misrepresentation of the Company's true financial condition.

113.    As a result, Wachovia's stock price was artificially inflated making it an imprudent investment for the Plan.

114.    Because Defendants knew or should have known that Wachovia was not a prudent investment option for the Plan, they had a fiduciary duty to protect the Plan and the participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Wachovia stock.

115.    Defendants had available to them several options for satisfying this duty, including: making appropriate public disclosures, as necessary; divesting the Plan of Wachovia

stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Plan participants; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve the Plan and the participants in connection with the Plan's acquisition and holding of Company stock.

## C.    DEFENDANTS FAILED TO PROVIDE PLAN PARTICIPANTS WITH TRUE AND ACCURATE INFORMATION ABOUT COMPANY STOCK

116.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

117.    Upon information and belief, Defendants made direct and indirect communications with the Plan's participants which included statements regarding investments in Company stock during the Class Period. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents, in which Defendants failed to disclose that Company stock was not a prudent retirement investment, and which were incorporated by reference in Plan documents. The Company regularly communicated with employees, including the Plan's participants, about the performance, future financial and business prospects of the Company's common stock.

118.    Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in 401(k) literature and the trade press, concerning investment generally in company stock, including that:

a)    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

b)   Out of loyalty, employees tend to invest in company stock;

c)   Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

d)   Employees tend not to change their investment option allocations in the plan once made;

e)   No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

f)   Lower income employees tend to invest more heavily in company stock than more affluent workers, through they are at greater risk; and

g)   Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

119.   Despite these facts and in light of the high concentration of the Plan's funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plan or the Plan participants from their heavy investment in an imprudent retirement vehicle, Wachovia stock.

120.   In addition, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company. As such, participants in the Plan could not appreciate the true risks presented by investments in Company stock and therefore could not make informed decisions regarding their investments in the Plan.

121.   Specifically, Defendants failed to provide the Plan's participants with complete and accurate information regarding Wachovia's serious mismanagement and improper business practices, including, among other things:

(a) the Company's reckless concentration on loan production in spite of the declining mortgage market;

(b) the Company's failure to limit its exposures and risks especially with respect to the acquisition of Golden West;

(c) the Company's failure to accurately account for its high-risk mortgage; and

(d) Wachovia's repeated misrepresentations of the Company's true financial condition.

## D.    DEFENDANTS' CONFLICTS OF INTERESTS

122.    Despite the availability of several options, Defendants put their own interests above the interests of the Plan by failing to take any action to protect participants from losses resulting from the Plan's investment in Company stock. In fact, Defendants chose to continue to allow investment of the Plan's assets in Company stock even as the Company's problems came to light, and elected not to perform investigations and/or take other appropriate steps to protect the Plan.

123.    As ERISA fiduciaries, Defendants are required to manage the Plan's investments, including the investment in Wachovia stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries. This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

124.    Conflicts of interest abound when a company that invests plan assets in company stock begins to fail. This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other. As courts have made clear "[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions." *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992) (citation omitted). Here, Defendants breached this fundamental fiduciary duty.

125.    First, Defendants failed to investigate whether to take appropriate and necessary action to protect the Plan, and instead, chose the interests of the Company over the Plan by continuing to offer Wachovia stock as a Plan investment option, continuing to make Company Matching Contributions in Wachovia stock, and continuing to maintain investments in Wachovia stock in the Plan.

126.    Second, certain of the Defendants who knew or should have known of Wachovia's inflated stock price during much of the Class Period, benefited directly from the knowledge or neglect by selling their personal holdings of Wachovia stock for significant gain. During the Class Period, Defendants Thompson, Richey and McFayden sold approximately 250,000 shares of Wachovia stock for proceeds of over $8.5 million. Defendants also failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

127.    While the above Defendants protected and enriched themselves, they stood idly by as the Plan lost *1.2 billion dollars* because of its investment in Wachovia stock. This is precisely the type of conflicted and disloyal action that ERISA was intended to prevent.

## IX.    THE RELEVANT LAW

128.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

129.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the

fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

130.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

131.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in pertinent part, that fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

132.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d. 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Wachovia Corp. Common Stock Fund and the Wachovia Stock Non-ESOP Fund, which invested in Wachovia stock, to ensure that each investment is a suitable option for the plan;

b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with a focus solely on the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

c)    The duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

133.    ERISA § 405(a); 29 U.S.C. § 1105(a). "Liability for Breach by Co-Fiduciary,"

provides, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>    (1)    if he participated knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
>    (2)    if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
>    (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

134.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary

responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be,

as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company

stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit

their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The

result would be a setting in which a major fiduciary breach could occur, but the responsible party

could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely

knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach...[T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties

and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

135.   Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2), 29 U.S.C. 1132(a)(2) for relief under ERISA § 409(a), 29 U.S.C. 1109(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1), 29 U.S.C. 1104(a)(1) and ERISA § 405(a), 29 U.S.C. 1105(a).

## X.    ERISA § 404(c) AFFIRMATIVE DEFENSE DOES NOT APPLY

136.   ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

137.   ERISA § 404(c) does not apply here for, among others, the following three reasons:

(a) ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering Wachovia stock as an investment option in the Plan as this is not a decision that was made or controlled by the participants. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 16 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WH 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550)(noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA §404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan");

(b) As to participant-directed investment in Wachovia stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Wachovia stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (participants must be provided with

"sufficient information to make informed decisions"). As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in Wachovia stock as a result of their investment directions, and the Defendants remain entirely responsible for losses that result from such investment; and

(c) Upon information and belief, the Plan participants were not informed that the Plan intended to comply as a § 404(c) plan in the manner required by ERISA and applicable regulations. Therefore § 404(c) of ERISA does not apply to participants' "investment decisions" regarding Wachovia stock and Defendants remain liable for losses suffered by participants during the Class Period as a result of suck decisions.

138.    Because ERISA 404(c) does not apply here, the Defendants' liability to the Plan, the Plaintiff and the Class (as defined below) for losses caused by the Plan's investment in Wachovia stock is established upon proof that such investment was or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

## XI.    DEFENDANTS' INVESTMENT IN WACHOVIA STOCK IS NOT ENTITLED TO A PRESUMPTION OF PRUDENCE

139.    The presumption of prudence that some courts have held applies to the decision to make and maintain investment in company stock in an ESOP does not apply here because the Plan was not, in fact, designed to require the offering of Company stock as a Plan investment option. Rather, Company stock is a discretionary feature of the Plan. Accordingly, the Plan lacks the principle feature on which the presumption of prudence is based – namely a need to balance two competing objectives of typical ESOPs - retirement savings on the one hand, and the goal of long term employee ownership on the other. Here, the Plan's only long-term purpose is retirement savings.

140.    To the extent that a presumption of reasonableness applies to the decision to maintain investments in company stock in the purported ESOP portion of the Plan, such presumption is overcome by the facts alleged here, including, among other averments:

- A precipitous stock price decline from over $56 to under $12 during the Class Period;

44

- Risk of further imminent collapse of the Company's stock price based on the Company's practices as described in detail herein; and

- Serious, if not gross, mismanagement evidenced by, among other things:

  - concentrating on loan production in spite of the declining mortgage market;

  - failing to limit its exposure to losses from its loan portfolio and CDO holdings;

  - failing to accurately account for its high-risk mortgage and CDO holdings; and

  - artificially inflating the Company's share price by misrepresenting the Company's financial condition.

141.    The imprudence of continued investment by Defendants in Wachovia stock during the Class Period runs afoul of Department of Labor regulations:

> [B]ecause every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. 2509.94-1.

142.    Defendants had available to them investment alternatives to Wachovia stock that had either a higher rate of return with risk commensurate to Wachovia stock or an expected rate of return commensurate to Wachovia stock but with less risk.

143.    Based on these circumstances, and the others alleged herein, it was imprudent and an abuse of discretion for Defendants to continue to make and maintain investment in Wachovia stock, and, effectively, to do nothing at all to protect the Plan from significant losses as a result of such investment during the Class Period.

## XII.   CAUSES OF ACTION

### COUNT I

**Failure to Prudently and Loyally Manage the Plan and Assets of the Plan
(Violation of §404 of ERISA, 29 U.S.C. §1104 by Defendants)**

144.   Plaintiff incorporates by this reference the paragraphs above.

145.   This Count alleges fiduciary breach against the following Defendants: the Compensation Committee Defendants and the Benefits Committee Defendants (the "Prudence Defendants").

146.   At all relevant times, the Defendants named in this Count were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

147.   As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the Trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, reviewing and making policy recommendations with respect to the Plan, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

148.   Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, these Defendants knew or should have known that Wachovia common stock no

46

longer was a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in light of the Company's improper business practices, serious mismanagement, and deteriorating financial circumstances. Nonetheless, during the Class Period, these Defendants continued to offer Wachovia stock as an investment option for participant contributions in the plan, provide Company Matching Contributions in Wachovia stock, and maintain the Plan's enormous investment in the stock.

149. The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because:

(a) Company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and

(b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

In view of this, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

150. The Prudence Defendants had no such procedure. Moreover, even in light of the losses, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in Wachovia stock, the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plan. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Wachovia stock under these circumstances.

151. The Prudence Defendants' decisions respecting the Plan's investment in Wachovia stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have

47

made different investment decisions. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plan's contributions and assets in Wachovia stock was in keeping with the Plan's settlor's expectations of how a prudent fiduciary would operate.

152.    The Prudence Defendants were obligated to discharge their duties with respect to the Plan with the case, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

153.    According to Department of Labor regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

154.    Again, according to Department of Labor regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

- o   The composition of the portfolio with regard to diversification;

- o   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

- o   The projected return of the portfolio relative to the funding objectives of the plan.

155.   Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Wachovia stock because, among other reasons:

(a) The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plan, the Company's:

(i) reckless concentration on loan production in spite of the declining mortgage market;

(ii) failure to limit its exposures and risks especially with respect to the acquisition of Golden West;

(iii) failure to accurately account for its high-risk mortgage and CDO holdings; and

(iv) repeated misrepresentations of Wachovia's true financial condition;

(b) The risk associated with the investment in Wachovia stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

(c) This abnormal investment risk could not have been known by the Plan's participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

(d) Knowing of this extraordinary risk, and knowing the Plan's participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plan or any participant from investing the Plan's assets in Wachovia stock; and

(e) Further, knowing that the Plan was not a diversified portfolio, but was heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

156.   The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  On information and belief, the Defendants acted in their own self-interest in benefiting from selling huge amounts of Company stock at fraudulently inflated values.  Additionally, compensation and tenure of the Prudence Defendants was tied to the performance of Wachovia stock and/or the publicly reported financial performance of Wachovia.  Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

157.   The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by *inter alia*, failing to engage prudent independent advisors who could

make independent judgments concerning the Plan's investment in Wachovia; failing to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Wachovia stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interest were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to Wachovia's inappropriate practices; engaging in insider sales of Wachovia stock and yet, taking no action to disclose to the Plan's participants the reason for their sales or to protect the Plan's holdings of Wachovia stock once proper disclosure was made; and by otherwise placing their own and Wachovia's improper interests above the interests of the participants with respect to the Plan's investment in Wachovia stock.

158.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plan suffered tremendous losses. If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost over *1.2 billion dollars* of retirement savings.

159.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Monitor Fiduciaries
### (Violation of § 406 of ERISA, 29 U.S.C. §1106 by Defendants)

160.    Plaintiff incorporates by this reference the allegations above.

161.    This Count alleges fiduciary breach against the following Defendants:   The Director Defendants and the Benefits Committee Defendants, through which the Company acted in carrying out its appointment responsibilities (the "Monitoring Defendants").

162.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERSIA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.   Monitoring fiduciaries are also responsible for determining that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

163.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "'hands-on'" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

164.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

165.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a) failing, at least with respect to the Plan's investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock;

> (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Wachovia's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plan's investment in Wachovia stock;

> (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and

> (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in Wachovia stock despite their knowledge of practices that rendered Wachovia stock an imprudent investment during the Class Period for participants' retirement savings in the Plan, and who breached their fiduciary duties under ERISA.

166.   As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost over 1.2 billion dollars of retirement savings.

167.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

### Breach of Fiduciary Duty - Failure to Provide Complete and Accurate Information to the Plan's Participants and Beneficiaries

168.    Plaintiff incorporates by this reference the allegations above.

169.    This Count alleges fiduciary breach against the following Defendants:   HR Defendants (the "Communications Defendants").

170.    At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

171.    At all relevant times, the scope of the fiduciary responsibility of the Communications Defendants included the communications and material disclosures to the Plan's participants and beneficiaries. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the Plan's investment options, including investment in Wachovia stock.

172.    Because investments in the Plan were not diversified (*i.e.* the Defendants chose to invest the Plan's assets, and/or allow those assets to be invested so heavily in Wachovia stock), such investment carried with it an inherently high degree of risk. This inherent risk made the

Communications Defendants' duty to provide complete and accurate information particularly important with respect to Wachovia stock.

173.    The Communications Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Wachovia's serious mismanagement and improper business practices and public misrepresentations, and the consequential artificial inflation of the value of Wachovia stock, and, generally, by conveying incomplete information regarding the soundness of Wachovia stock and the prudence of investing and holding retirement contributions in Wachovia equity.    These failures were particularly devastating to the Plan and its participants and beneficiaries. A heavy percentage of the Plan's assets were invested in Wachovia stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

174.    The Communications Defendants' omissions clearly were material to Plan participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by the Plan's investment in Wachovia stock.

175.    The Communications Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that the Communications Defendants failed to provide complete and accurate information to any of the Plan's participants.

176.    The Communications Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

177.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

178.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Communications Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

**Breach of Fiduciary Duty – Failure to Disclose Necessary Information to Co-Fiduciaries.**

179.    Plaintiff incorporates by this reference the allegations above.

180.    This Count alleges fiduciary breach against the following Defendants: Defendant Wachovia and Defendants Thompson, Richey and McFayden.

181.    Pursuant to the duties of prudence and loyalty which every ERISA fiduciary owes to the plans that he serves pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), such fiduciaries are required to disclose to their co-fiduciaries information that they know is unavailable to their co-fiduciaries, but that such co-fiduciaries need to protect the interests of the plan. *See Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities*, 93 F.3d 1171 (3rd Cir. 1996).

182.    Defendant Wachovia and Defendants Thompson, Richey and McFayden possessed non-public information during the Class Period about the risks posed by Wachovia stock, which they knew could be used by other fiduciaries of the Plan (in particular the Compensation Committee Defendants, the Benefits Committee Defendants, and the Human Resources Defendants) to protect the Plan and its participants and beneficiaries.

183.    Defendant Wachovia and Defendants Thompson, Richey and McFayden profited from their breach of this duty.

184.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendant Wachovia and Defendants Thompson, Richey and McFayden are liable to

restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count, to disgorge any profits made through their breach and to provide other equitable relief as appropriate.

## COUNT V

### Co-Fiduciary Liability
### (Violation of § 405 of ERISA, 29 U.S.C. § 1105 by Defendants)

185.    Plaintiff incorporates by this reference the allegations above.

186.    This Count alleges co-fiduciary liability against the following Defendants: all Defendants (the "Co-Fiduciary Defendants").

187.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

188.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

189.    **Knowledge of a Breach and Failure to Remedy**. ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Co-Fiduciary Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy

those breaches. In particular, they did not communicate their knowledge of the Company's improper activities to the other fiduciaries.

190.    Wachovia, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices, and, thus, knowledge of such practices is imputed to Wachovia as a matter of law.

191.    Because the Co-Fiduciary Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Wachovia's failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

192.    **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Wachovia knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for the Plan's participants. Likewise, the Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Wachovia stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.

193.    **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

194.    The Monitoring Defendants' failure to monitor the Defendants, particularly the Prudence Defendants enabled that committee to breach its duties.

195.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost over 1.2 billion dollars of retirement savings.

196.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT VI

### Knowing Participation in a Breach of Fiduciary Duty

197.    Plaintiff incorporates by this reference the allegations above.

198.    To the extent that Wachovia is found not to have been fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Wachovia knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

199.    Wachovia benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by the Plan, contributing Wachovia stock to the

Plan while the value of the stock was inflated as the result of Wachovia's highly risky and improper business and accounting practices, and providing the market with materially misleading statements and omissions. Accordingly, Wachovia may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Wachovia stock which would have been contributed to the Plan, but for Wachovia's participation in the foregoing breaches of fiduciary duty.

### XIII.  CAUSATION

200.    The Plan suffered more than 1.2 billion dollars in losses because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Wachovia stock during the Class Period, in breach of Defendants' fiduciary duties.

201.    Defendants are liable for the Plan's losses in this case because:

   (a) the ESOP's investment in Wachovia stock was the result of the Prudence Defendants' decision to invest a portion of the Company Matching Contributions in the Plan Wachovia stock; and

   (b) as to the portion of the Plan's assets invested in Wachovia stock as a result of participant contributions and/or Company Matching Contributions, the Prudence Defendants are liable for these losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

202.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Wachovia stock as an investment alternative when it became imprudent, and divesting the Plan of Wachovia stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly, the participants suffered.

60

## XIV.  REMEDY FOR BREACHES OF FIDUCIARY DUTY

203.   The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Wachovia stock during the Class Period.

204.   As a consequence of the Defendants' breaches, the Plan suffered significant losses.

205.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary ... who breaches any of the duties imposed upon fiduciaries ... to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate ...."

206.   With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan's participants would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investment available to them. Alternatively, losses may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of Wachovia stock that the Plan would have acquired had the Plan's fiduciaries taken appropriate steps to protect the Plan. The Court should adopt the measure of loss most advantageous to the Plan. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

207.   Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of:

(a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

(c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach;

(d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

(e) taxable costs and interest on these amounts, as provided by law; and

(f) such other legal or equitable relief as may be just and proper.

208. Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

**PRAYER FOR RELIEF WHEREFORE,** Plaintiff prays for relief as follows:

A.    Declare that each Defendant has violated ERISA's prohibited transactions provisions and breached their fiduciary duties to the participants under ERISA;

B.    Declare that each Defendant is not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    Issue an Order certifying a class under Fed. R. Civ. P. 23;

D.    Issue an Order compelling the Defendants to restore all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses suffered by the Plan resulting from imprudent investment of the Plan's assets in Wachovia stock;

E.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.     Issue an Order requiring Defendants to permanently remove Defendants from any position of trust with respect to the Plans and appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Wachovia stock;

G.     Award Plaintiff actual damages in the amount of any losses the Plan suffered;

H.     Award Plaintiff attorneys' fees and costs pursuant to ERISA 502(g), 29 U.S.C. §1132(g), and/or the Common Fund doctrine, and other applicable law;

I.     Issue an Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants; and

J.     Award such other and further relief as the Court deems equitable and just.

DATED: New York
July 25, 2008

Respectfully submitted,
**KELLER ROHRBACK L.L.P**

David S. Preminger (DP-1657)
dpreminger@kellerrohrback.com
275 Madison Avenue, Suite 1425
New York, New York 10016
Telephone: (212) 878-8890
Fascimile: (212) 867-6878

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge
ralockridge@locklaw.com
Karen H. Riebel
khriebel@locklaw.com
Elizabeth R. Odette
erodette@locklaw.com
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

**ZIMMERMAN REED**
Carolyn G. Anderson
cga@zimmreed.com
Timothy J. Becker
tjb@zimmreed.com
Kristen D. Hedberg
kdh@zimmreed.com
651 Nicollet Mall
Suite 501
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

*Counsel for Plaintiff*

64